## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:22-cr-00002-JPH-CMM-1 |
| | ) | |
| SHANE M. MEEHAN, | ) | |
| Defendant. | ) | |

## MOTION TO STRIKE GOVERNMENT'S NOTICE OF INTENT TO SEEK THE DEATH PENALTY DOCKET 170

The defendant, Shane M. Meehan, by counsel, moves this Court to strike the government's Notice of Intent to Seek the Death Penalty (Dkt. #170), filed on November 18, 2025. In support of this motion, Mr. Meehan submits the following:

**Introduction**

On November 18, 2025, the government filed a notice of intent to seek the death penalty against Shane Meehan. Dkt. #170. But this notice was filed *three years and four months after* the government filed its formal notice of intent *not* to seek the death penalty ("no-seek"). Dkt. #75. Upon filing the no-seek in July 2022, the government informed the Court, Mr. Meehan, and Mr. Meehan's appointed counsel that the no-seek represented the government's "final decision" not to seek the death penalty. Dkt. #166 (Tr. 7-28-2022) at 2.

The government is not entitled to renege on its "final decision" not to seek the death penalty.[1] "'The fair administration of justice does not countenance the use of such ploys.'" *United States v. Beidleman*, Crim. Case No. 25-270, 2025 WL 2803850, *15 (D.D.C. Oct. 1,

---

[1] *See* Dkt. #166 (Tr. 7-28-2022) at 2 (confirming that the decision was "final"); *see also United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (noting that the government's *decision* not to pursue the death penalty is "irrevocable").

2025) (quoting *United States v. Pitts*, 331 F.R.D. 199, 204 (D.D.C. 2019) (citing *United States v. Fields*, 475 F. Supp. 903, 908 (D.D.C. 1979)). The government's about face, seeking the death penalty after definitively stating that it would not, violates the Constitution and federal statutes and defies equitable principles.

In every case to address the government's attempt to revoke a no-seek, district courts have prohibited the government's reversal and struck the belated notice of intent to seek the death penalty.[2] The government's attempt to revoke its decision not to seek the death penalty is unlawful for several reasons: First, the operative statute, 18 U.S.C. § 3593(a), does not permit the government to seek the death penalty after filing a prior formal notice that the government would *not* seek the death penalty. At the very least, as a matter of the Court's supervisory authority, it should prevent such a reversal. Second, the government waived its right to seek the death penalty and is estopped from seeking the death penalty because it informed the Court and defense counsel that it would not seek the death penalty. Third, it would violate due process, equal protection, and the Eighth Amendment to permit the government to seek the death penalty. And finally, even if the Court construes the government's reversal as an amended notice, despite the government assuring the Court that its prior decision was "final," an amended notice is not permissible because the change is not supported by good cause.

The government's reversal is particularly egregious here because developments since the July 2022 no-seek have provided additional reasons not to seek the death penalty—not newfound

---

[2] *See United States v. Ahemeid*, 20-cr-502, 2025 WL 3120470, at *1 n.1 (E.D.N.Y. Nov. 7, 2025) (collecting cases); *see also United States v. Spurlock*, 782 F. Supp. 3d 987 (D. Nev. 2025); *United States v. Constanza-Galdomez*, 787 F. Supp. 3d 131 (D. Md. 2025); *United States v. Cole*, 2023-cr-0016, 2025 WL 1360499 (D.V.I. Sept. 7, 2025); *United States v. Dangleben*, 3:23-cr-0072, 2025 WL 2647195 (D.V.I. Sept. 15, 2025); *United States v. Suarez*, 5:24-cr-00226, 2025 WL 2710094 (N.D. Cal. Sept. 23, 2025); *United States v. Merrell*, 3:20-CR-46, 2025 WL 2911170 (N.D.W.V. Oct. 7, 2025).

reasons to seek the death penalty. In November 2024, defense counsel, the government, and the Court all agreed that Mr. Meehan was incompetent to stand trial. In October 2025, BOP mental health evaluators determined that Mr. Meehan was severely mentally ill *at the time of the crime*. The government's own mental health evaluators have concluded Mr. Meehan suffered from delusional disorder, a major mental disorder, *at the time of the offense* for which they now seek the death penalty. Contrary to the government's recent actions, Mr. Meehan's severe mental illness counsels against seeking the death penalty, not in favor.

Moreover, the supposedly "final decision" not to seek the death penalty meant that defense counsel strategized as if this were not a death penalty case – because it was not. Revoking the no-seek would thus incurably prejudice defendant.[3]

Therefore, the Court should join every district court to address this issue and strike the November 18, 2025 notice of intent to seek the death penalty and prohibit the government from seeking the death penalty against Mr. Meehan.

## I. Background
### A. The Alleged Offense Conduct

The complaint, filed on July 8, 2021, and the Indictment, filed on January 19, 2022, alleged that on July 7, 2021, Mr. Meehan drove to the Terre Haute FBI resident agency and lobbed an incendiary device toward the building. Dkt. #10, 39. FBI Task Force Officer Gregory J. Ferency left the building, apparently to retrieve something from his car, and Mr. Meehan, according to the complaint, shot him with a firearm. *See id.*; *see also* Dkt. #10 (Criminal

---

[3] It would be unfair if the government going back on its word resulted in defense counsel having to disclose strategy decisions made in light of the no-seek. Suffice to say, death penalty cases involve different strategy decisions. Should the Court require more information, an ex parte submission would be more appropriate than disclosing this information to the government; even that, however, is unfair.

Complaint & Affidavit). Officer Ferency returned fire, and FBI Special Agent Ryan Lindgren ran out of the building and engaged Mr. Meehan in a gun battle. Mr. Meehan was struck twice. Officer Ferency later died from his injuries. *See* Dkt. #10.

**B. The Government's "Final Decision" Declining to Seek the Death Penalty**

While Mr. Meehan was hospitalized in intensive care and heavily medicated, on July 9, 2021, the Court held a hearing in Mr. Meehan's room in the intensive care unit. Dkt. #11; *see also* Dkt. #29 at 3-4. The magistrate judge ordered that Mr. Meehan be detained. Dkt. #11.

On August 13, 2021, the Court held an initial appearance. Dkt. #29. At that hearing, counsel for Mr. Meehan pointed to his long history of head injuries and mental health issues, including a traumatic brain injury, Parkinson's disease, and a seizure disorder, as well as inpatient mental health treatment for acute psychosis and paranoia and prescriptions for major antipsychotics, including Seroquel and Haldol. Dkt. #29 (Tr. 8-13-2021) at 15.

A three-count indictment was issued on January 19, 2022. Dkt. #39, 40. Count 1 charged Mr. Meehan with premeditated murder of a federal officer, Officer Ferency, who was a task force officer for the Federal Bureau of Investigation. Count 2 alleged the attempted arson of federal property. Count 3 alleged a violation of 18 U.S.C. § 924(j), use of a fireman in relation to a crime of violence in which death results. The grand jury made special findings under 18 U.S.C. § 3591, a prerequisite for the possibility that the government might seek the death penalty. *Id.* On January 24, 2022, the court held an initial appearance on the indictment. Dkt. #62.

On April 25, 2022, the Court held a status conference. Dkt. #65. Counsel for Mr. Meehan asked the Court to schedule a deadline for the government to file notice of intent to seek the death penalty. Dkt. #68 (Tr. 4-25-2022) at 14. Counsel pointed out that it was not possible to move forward without knowing whether the case was a death penalty case or not, explaining to the Court that "death penalty cases are different. It's not just that they're more complicated, it's

not just that they take longer, it's not a murder case o[n] steroids . . . they are quantitatively and qualitatively different in part because of the amount of investigation that has to be done is more, but it's also different." *Id.* at 9, 15. Counsel for the government argued that the process was complicated and "completely out of this table's prosecutors' hands." *Id.* at 17. After hearing from the government and defense, the Court set a status conference for June 9, 2022. *Id.* at 23-24.

At the June 9, 2022 status conference, the Court did set a deadline for the government to inform defense counsel of the local U.S. Attorney's recommendation on the death penalty. The Court set the next status conference for July 28, 2022, ordering "that by the time of that conference for the United States Attorney to either have notified defense counsel that it's going to recommend the expedited no-seek or have made a firm commitment to a date on which defense counsel can come in and make the mitigation presentation." Tr. 6-9-2022 at 6.

On July 11, 2022, the government filed a notice stating it would not seek the death penalty. Dkt. #75. Though the government is not required to and did not state the reasons why it rejected the death penalty, its decision was clearly correct. Mr. Meehan is unlike persons who are generally charged with the death penalty. He has no criminal history. He was an extraordinary father to incredible children. He taught them good values, coached their sports teams, and helped them navigate the troubles of childhood and adolescence. He was gainfully employed throughout his adult years. His law-abiding nature is perhaps best exemplified by his decorated history as a prison guard first in the Indiana Department of Corrections and then at the United States Penitentiary in Terre Haute where he served on the death row unit. He was medically retired from the BOP at the age of 40 for medical and mental health problems. It will take significant investigation into Mr. Meehan's background, including his medical and mental health history, to understand how Mr. Meehan came to find himself charged with killing a TFO officer in an

unprovoked attack. What is known, at this point, is that Mr. Meehan suffered a series of documented head injuries, beginning with his participation in high school football. There are literally thousands of pages of medical and mental health records that predate the offense, all of which were shared with the government prior to the no-seek decision. Mr. Meehan's bizarre presentation was documented by the government when witness after witness described to law enforcement his odd behavior prior to the offense. The government could find no rational motive or explanation for this shooting because there is none. Simply, this is not a death penalty case.

At the July 28, 2022 status conference, the Court "wanted to confirm that the filing [indicating the government would not seek the death penalty] represents the final decision having been made and approved at all necessary levels at Main Justice," and the government informed the Court that it did represent the final decision of Main Justice. Dkt. #166 (Tr. 7-28-2022) at 2. At the hearing, it was generally acknowledged that the government's announcement that it would not seek the death penalty was "a game changer." Discussing reciprocal discovery, defense counsel informed the Court, "Obviously with the July 11th filing [stating the government would not seek the death penalty] we have sort of re-jiggered our position on where we are and where our investigation is going on this case." *Id.* at 4. The Court summarized the discussion perfectly, stating that "the Government's decision on the death penalty is a game changer, creating a different landscape." Dkt. #166 (Tr. 7-28-2022) at 6.

The Court then set a trial date of May 8, 2023, scheduling a noncapital trial. Dkt. #80.

**C. Finding that Mr. Meehan is Incompetent to Stand Trial**

Prior to the scheduled trial date, on February 21, 2023, defense counsel filed a motion to determine Mr. Meehan's mental competency, which the Court granted on March 2, 2023. Dkt. #81, 82. Defense counsel also filed a motion to continue the trial date, which the Court also granted. Dkt. #83, 84. A forensic evaluation was provided to the Court. Dkt. #93 (forensic

evaluation filed under seal). The examiner acknowledged that Mr. Meehan was mentally ill but determined that he was competent to stand trial. *Id.* On April 5, 2024, defense counsel provided notice, pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure, of an insanity defense. Dkt. #122.

Additional competency litigation ensued and additional evaluations were submitted. Dkt. #128, 129 (forensic evaluations filed under seal).

In October 2024, the BOP evaluator determined that Mr. Meehan was not competent to stand trial. Dkt. 128. The examiner (the same psychologist who had determined in 2023 that Mr. Meehan was competent) "attributed his decompensation to active symptoms of psychosis." *Id.*

At a competency hearing on November 25, 2024, the parties agreed that Mr. Meehan was not competent to proceed. Dkt. #136. The Court found Mr. Meehan incompetent. Dkt. #136. Following the hearing, Mr. Meehan was returned to BOP for restoration proceedings. *Id.* On April 25, 2025, BOP asked for more time to conduct restoration proceedings, opining that, at that time, "Mr. Meehan remains not competent to proceed in his case." Dkt. #146 (under seal). The Court granted that request and extended the evaluation period through August 29, 2025. Dkt. #147 (under seal).

On August 12, 2025, the BOP informed the parties and the Court that, in BOP's opinion, Mr. Meehan's competency had been restored and that the BOP was thus beginning its evaluation of Mr. Meehan's sanity at the time of the offense. Dkt. #152, 153 (under seal). On November 7, 2025, the BOP provided the Court with a forensic evaluation of Mr. Meehan's sanity at the time of the offense conduct. Dkt. #163. The BOP evaluator opined that Mr. Meehan was sane but that he suffered from a major mental illness – delusional disorder – at the time of the offense. As of

the date of this filing, since Mr. Meehan was found incompetent, there has been no judicial decision that he is competent.

**D. The Government's Reversal of its "Final Decision"**

On November 18, 2025, the government announced its intent to renounce its "final decision" that it would not seek the death penalty. The shift was not the result of any intervening change in the law or discovery of new evidence. Indeed, the developments since the government's 2022 no-seek provided additional reasons not to seek the death penalty: in November 2024, the defense, the government, and the Court all agreed that Mr. Meehan was incompetent to stand trial, and in October 2025, BOP mental health evaluators determined that Mr. Meehan was severely mentally ill at the time of the crime. The decision to reverse course and seek the death penalty—despite the only changes in the case being mounting evidence of Mr. Meehan's significantly compromised mental health, including at the time of the crime—resulted solely from the change in administrations and corresponding policy changes.

On January 20, 2025, the day the new Administration assumed office, the President issued an executive order, "Restoring the Death Penalty and Protecting Public Safety."[4] Among other things, that executive order explicitly stated: "[T]he Attorney General shall, where consistent with applicable law, pursue Federal jurisdiction and seek the death penalty regardless of other factors for every federal capital crime involving . . . the murder of a law-enforcement officer." *Id.*

On February 5, 2025, the day after Pam Bondi was confirmed as Attorney General, she issued a memorandum to attorneys in the Department of Justice, "Reviving the Federal Death

---

[4] Available at: https://www.whitehouse.gov/presidential-actions/2025/01/restoring-the-death-penalty-and-protecting-public-safety/

Penalty and Lifting the Moratorium on Federal Executions."[5] Among other things, that memorandum, following the President's executive order, states: "Absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in cases involving the murder of a law-enforcement officer." *Id.* Her memorandum also directed the Capital Review Committee "to review no-seek decisions in all pending capital-eligible cases (*i.e.*, death-eligible cases that have not yet resulted in a conviction) charged between January 20, 2021, and January 19, 2025. This group shall reevaluate no-seek decisions and whether additional capital charges are appropriate. . . . The review required by this paragraph shall be completed within 120 days." *Id.*

In April 2025, the government contacted defense counsel about the possibility of the death penalty, and in July 2025, defense counsel presented to the Capital Case Review Committee. Throughout this time, the government and BOP agreed with defense counsel that Mr. Meehan was incompetent—it was not until August 2025 that the BOP opined that his competency had been restored. Dkt. #146, 152, 153 (under seal). BOP evaluators have also recognized that Mr. Meehan was mentally ill at the time of the crime. Dkt. #163.

On November 18, 2025, the government filed a notice of intent to seek the death penalty against Mr. Meehan. Dkt. #170.

One key point about the timing is that Mr. Meehan had a trial set for May 2023, before the change in administration. That trial did not go forward because Mr. Meehan was incompetent to stand trial. Had the trial gone forward, or had Mr. Meehan been competent to plead guilty and decided to plead, then his case would not have been pending at the time of Attorney General Bondi's February 5, 2025 memo, and Mr. Meehan would not have been subject to the directives

---

[5] Available at: https://www.justice.gov/ag/media/1388561/dl?inline

in that memo or the January 20, 2025 executive order. Had Mr. Meehan been competent, undersigned counsel would have resolved the case via plea or trial prior to January 20, 2025.

## II. Legal Argument

For several reasons, the Court should strike the government's November 18, 2025, notice of intent to seek the death penalty against Mr. Meehan (Dkt. #170) with prejudice to refiling any additional such notice under 18 U.S.C. § 3593(a). That is what every court faced with this issue has done. Allowing the government to seek the death penalty after a formal no-seek notice violates the governing statute, 18 U.S.C. § 3593. The government has waived its ability to seek the death penalty against Mr. Meehan and is estopped from seeking the death penalty against him. Seeking the death penalty after a formal no-seek notice also violated Mr. Meehan's Due Process, Equal Protection, and Eighth Amendment rights. And, even if the government construes the notice as an amended notice, the government should not be permitted to amend its notice because there is no good cause. Indeed, all that has happened in this case since the government's no-seek is that the BOP has determined that Mr. Meehan is seriously mentally ill. Moreover, in 2022, the Court set deadlines to ensure the Court and defense counsel would be informed about the schedule for deciding whether to seek the death penalty. Announcing the intention to seek the death penalty three years after announcing the "final decision" not to seek the the death penalty does not comply with those deadlines. Finally, allowing the government to reverse course and seek the death penalty at any time creates a completely unworkable system, wherein every capital eligible case must be staffed as a capital case until a plea is accepted or a trial is started.

## A. Section 3593(a) Does Not Authorize a Reversal of Prior Decision by DOJ Not to Seek the Death Penalty.

The governing statute, 18 U.S.C. § 3593(a), does not permit the government to reverse its no-seek, a formal representation to the Court of the government's decision *not* to seek the death

penalty. *See Spurlock*, 782 F. Supp. 3d at 1014 ("[T]he Court agrees with Defendant that the FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so.").

Although the statute does not explicitly require formal notice of the government's decision *not* to seek the death penalty, the DOJ believes such notice is required by the spirit of § 3593(a)—in particular, in order to relieve district courts of their obligation to comply with the special requirements for appointed counsel in capital cases, as required by 18 U.S.C. § 3005, including the appointment of "learned counsel." *See* U.S. Dep't of Justice, Justice Manual, § 9-10.150.[6] And in this case, the Court required the government to keep the Court and defense counsel informed about whether this would be a death penalty case, recognizing that whether or not the government seeks death is a "game changer" because noncapital cases are a completely "different landscape" from capital cases. Dkt. #166 (Tr. 7-28-2022) at 6.

The statute's notice requirement is essential to the fair administration of the federal death penalty because of the interplay between 18 U.S.C. §§ 3005, 3593, and 3599, which governs the appointment of counsel, investigators, and experts in capital cases. The potential for a death sentence creates multiple time-consuming and costly obligations on the part of the federal court system to administer, including locating learned counsel willing to be appointed, appointing a

---

[6] DOJ's manual directs prosecutors to "promptly inform the district court and counsel for the defendant once the Attorney General has made the final decision" whether to pursue a death sentence. It explains that "[e]xpeditious communication is necessary so the court is aware, in cases in which the Attorney General directs the [government] not to seek the death penalty," that enhanced defense resources are "no longer required" by statute. U.S. Dep't of Justice, Justice Manual, § 9-10.150, available at https://www.justice.gov/jm/jm-9-10000-capital-crimes. Since the 2001 revision of the manual, DOJ's manual has directed the government to "promptly" advise district courts of a no-seek decision so that courts are aware that enhanced defense resources are no longer required. *See* United States Attorneys' Manual, § 9-10.020 (2001 revision), available at https://www.justice.gov/archive/usao/usam/1997/1997USAM_Title%209 %20Criminal_Part2.pdf.

mitigation specialist and various types of specialized experts for capital cases, and creating budgets for travel. Indeed, with the filing of the Notice of Intent, the staffing of this case is set to change dramatically. If a formal notice that the government is *not* seeking the death penalty can be withdrawn for any reason or no reason at all, then the federal judiciary loses its ability to fairly and efficiently administer the various statutory obligations and additional obligations created by the Judicial Conference of the U.S. Courts.[7]

Although the statute permits an amendment of a prior notice of the government's intent to *seek* the death penalty based on good cause, it does not contemplate an outright reversal of the government's formal notice that it would *not* seek the death penalty.[8] Any question about what the statute requires or prohibits should be resolved in a defendant's favor under the rule of lenity (particularly when the death penalty is at issue). *See McNally v. United States*, 483 U.S. 350, 360 (1987). Therefore, the filing of the government's original notice—which the government previously assured the Court was a final decision, approved by Main Justice—forecloses the government's ability under § 3593(a) to file a subsequent, contrary notice stating that it would seek the death penalty for the newly-filed death-penalty-eligible charges in a superseding indictment. Other courts have reached this conclusion. *See Spurlock*, 782 F. Supp. 3d at 1015-16.

Accordingly, the Court should strike the government's November 18, 2025 notice because it violates § 3593(a). At the very least, even if not required by the statute itself, the Court

---

[7] This concern is discussed more fully below, in Section G.

[8] Withdraw decisions must be based on changed facts and circumstances, underscoring that decisions whether or not to seek the death penalty must be based in facts and reasons, not subject to whims. The Justice Manual instructs that, if requesting deauthorization in a case where the death penalty was previously authorized, the prosecutor: "should base the withdrawal request on material changes in the facts and circumstances of the case from those that existed at the time of the initial determination." U.S. Dep't of Justice, Justice Manual, § 9-10.160.

should hold, as a matter of its supervisory authority, that once the government has filed a formal notice of its intent *not* to seek the death penalty, it may not thereafter seek the death penalty.

**B. The Government's July 2022 Notice Affirmatively Waived the Government's Ability to File a Notice Under 18 U.S.C. § 3593(a).**

Alternatively, even assuming that § 3593(a) does not speak to whether the government can seek the death penalty after filing a contrary, prior notice of intent not to seek the death penalty, the government's formal no-seek notice affirmatively and irretrievably waived its ability to seek the death penalty under § 3593(a). The Supreme Court has explained that "waiver is the intentional relinquishment or abandonment of a known right," which "extinguish[es]" that right. *United States v. Olano*, 507 U.S. 725, 733-34 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (noting that "forfeiture is the failure to make the timely assertion of a right," while "waiver is the intentional relinquishment or abandonment of a known right"). Both the government and criminal defendants are subject to the waiver doctrine. "[I]n fairness, what is sauce for the defendant's goose is sauce for the government's gander." *United States v. Caraballo-Cruz*, 52 F.3d 390, 393 (1st Cir. 1995) (referring to waiver).

There can be no clearer example of waiver than filing a formal notice with the Court that the government did not intend to seek the death penalty. This is particularly true where, as here, the Court sought to "confirm that the filing represents the final decision having been made and approved at all necessary levels at Main Justice," and the government did so confirm. Dkt. #166 (Tr. 7-28-2022) at 2.

Section 3593(a) creates a "prophylactic" right for a potential capital defendant with corresponding specific procedural requirements that the government must satisfy in order to seek the death penalty against a defendant. *See United States v. Ferebe*, 332 F.3d 722, 727 (4th Cir. 2003). The government's formal statement in a court filing that it does not intend to satisfy those

procedural requirements operates as an irrevocable waiver of the government's ability in the future to seek to satisfy those procedural requirements. *Cf. United States v. Waggoner*, 339 F.3d 915, 918 (9th Cir. 2003) (in discussing the requirement that two counsel — including one "learned counsel" — be appointed in a capital case, 18 U.S.C. § 3005, the court noted "the government's *irrevocable decision* not to pursue the death penalty" when it filed a notice that it was not seeking the death penalty) (emphasis added).

Therefore, the government's July 2022 formal no-seek waived the government's ability to thereafter reverse course and seek the death penalty.

## C. The Government Is Estopped from Filing a Notice that It Intends to Seek the Death Penalty Under 18 U.S.C. § 3593(a).

In addition to having waived its ability to file a § 3593(a) notice of its intent to seek the death penalty, the government is estopped from doing so. There are at least three different types of estoppel that apply here: judicial estoppel, equitable estoppel, and promissory estoppel.

### 1. Judicial Estoppel

For essentially the same reasons that the district courts gave in applying the judicial estoppel doctrine in *Spurlock* and *Constanza-Galdomez*, the Court should hold that the government's November 18, 2025 notice is barred by the judicial estoppel doctrine. *See Spurlock*, 782 F. Supp. 3d at 1009 ("The Court also finds — as a standalone basis for the use of discretion to strike the Death Notice — that the principles of judicial estoppel preclude the government from reversing its formal, timely-filed July No-Seek notice, especially where no case-related developments occurred following the July Notice to bear on the reversal decision."); *Constanza-Galdomez*, 787 F. Supp. 3d at 147-48. Those courts applied the Supreme Court's three-part test set forth in *New Hampshire v. Maine*, 532 U.S. 742 (2001), governing claims of judicial estoppel:

First, "a party's later position must be clearly inconsistent with its earlier position." *New Hampshire*, 532 U.S. at 750. Second, courts "inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *Id.* at 750-51. And third, courts ask "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 751.

Applying those three factors, the *Spurlock* court concluded that the government's previous filing of a formal notice that it would *not* seek the death penalty estopped it from changing its position many months later and filing a contrary notice of its intent to seek the death penalty. *Spurlock*, 782 F. Supp. 3d at 1009-11.

The court also stated:

> The government insists it has not engaged in bad faith because it has not deliberately manipulated the Court or acted with intent to deceive, but only changed position in accordance with new DOJ directives under a new administration. The Court need not and does not reach a finding of misconduct in this narrow sense. But the fact remains that the government decided — certainly not by inadvertence or accident — to reverse course on an issue of critical importance, involving Spurlock's life, less than two weeks before trial, with full knowledge that the reversal would have a chaotic impact on the progression of this case and would make it impossible to proceed to trial on the scheduled date. Under the circumstances, this is certainly tantamount to playing "fast and loose" with the Court's orders in particular and the judicial process in general; the government's good faith is cold comfort.

*Spurlock*, 782 F. Supp. 3d at 1013.

The Court should reach the same conclusion in Mr. Meehan's case. First, the government's November 18, 2025 notice is diametrically contrary to the government's prior July 2022 formal notice.

15

Second, the Court relied on the government's July 2022 notice that it would not seek the death penalty (as did defense counsel). The Court relied on the original notice by managing this case and arranging the Court's calendar in reliance on that non-capital trial date, including scheduling a *noncapital* trial to commence in May 2023. *See* Dkt. #80. (The trial was continued because Mr. Meehan was found incompetent. *See* Dkt. #84, 136.) *Cf.* Spurlock, 782 F. Supp. 3d at 1011 ("The Court has ... adopted and relied on the July 2024 No-Seek Notice in ... explicit and implicit ways, many of which the Court has already discussed, throughout the eight months since that decision, including by clearing its calendar [during the trial dates], [and] ... addressing pretrial timing and motions with a scheduled non-capital trial in mind ....").

Third, the government clearly would derive an unfair advantage, and it would impose an unfair detriment on the defense if the government is not estopped from seeking the death penalty. As the court in *Spurlock* stated:

> [T]he government would clearly "receive an unfair benefit" or "impose an unfair detriment" if not estopped. As Defendant notes, the government provides no real response to the arguments that "the defense would have litigated differently, interviewed witnesses differently, prioritized witnesses differently, approached and hired experts differently — had it not been informed the case was not capital" Preparation for a non-capital trial cannot be simply imported into a capital case, with its combined guilt and penalty phases. In order to present an "integrated defense theory" in a capital case, it is "critical" that such a theory be formulated "well before trial" and reinforced "during all phases of the trial, including jury selection, witness preparation, pretrial motions, opening statement, presentation of evidence, and closing argument."

*Spurlock*, 782 F. Supp. 3d at 1011-12 (citing *ABA Guidelines*, Guideline 10.10.1 (Trial Preparation Overall) (noting that when the government seeks capital punishment, defense "Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies").

Because, just as in *Spurlock*, the government in this case has played "fast and loose" which resulted in detrimental reliance by Mr. Meehan, the government should be judicially estopped from seeking the death penalty.

## 2. Equitable Estoppel

`        Equitable estoppel "arises where one, by his conduct, lulls another into a false security, and into a position he would not take only because of such conduct." *Bomba v. W. L. Belvidere, Inc.*, 579 F.2d 1067, 1071 (7th Cir. 1978). "[I]t is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay. Rather, all that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit." *Id.* (citations omitted).

"As colleagues at bar and officers of the court, and to ensure the efficient, accurate and just operation of judicial proceedings, counsel must be able reasonably to rely on representations made by fellow counsel in the context of litigation." *Miranda v. Contreras*, 754 A.2d 277, 281 (D.C. App. 2000). Based on the government's formal representation made in July 2022, the Court should apply the equitable-estoppel doctrine as well as the related but distinct judicial-estoppel doctrine.

Clearly, when the government filed its July 2022 notice that it would not seek the death penalty, Mr. Meehan and his counsel were misled into believing that the death penalty was off the table and thereby relied on that "final" decision to their detriment. In particular, during the three years and four months that followed, no preparation for a death penalty trial occurred, and strategic decisions were made based on the understanding that the government was not pursing the death penalty.

The government should be equitably estopped from seeking the death penalty.

### 3. Promissory Estoppel

The government's November 18, 2025 notice also should be barred under the promissory-estoppel doctrine. The elements of promissory estoppel are (1) a clear and definite promise; (2) where the promisor has a reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) which does induce actual and reasonable action or forbearance by the promisee; and (4) causes a detriment which can only be avoided by the enforcement of the promise. Restatement (Second) of Contracts § 90 (1979).

The government's July 2022 notice was a "clear and definite promise" that the government would not seek the death penalty; the government had a reasonable expectation that Mr. Meehan and his counsel would rely to their detriment on that promise (by not conducting a mitigation investigation, engaging in capital motions practice, or preparing for potential capital charges and a death penalty trial); Mr. Meehan and his counsel did so rely to their detriment on the July 2022 notice for a period of three years and four months; and the only manner to avoid this detriment is to enforce the government's promise.

*Black's Law Dictionary* defines a promise as "[t]he manifestation of an intention to act or refrain from acting in a specified manner, conveyed in such a way that another is justified in understanding that a commitment has been made." *Black's Law Dictionary* (10th ed. 2014). The government's formal July 2022 notice filed on the docket stated: "The United States of America, by counsel, Zachary A. Myers, United States Attorney for the Southern District of Indiana, and William McCoskey, Lindsay Karwoski, and Kathryn Olivier, Assistant United States Attorneys, respectfully gives notice to the Court that it will not seek the death penalty in this cause." Dkt. #75. That statement clearly qualified as manifestation of an intention to refrain from acting in a specified manner, conveyed in such a way that Mr. Meehan was justified in understanding that a commitment not to seek the death penalty had been made. This is particularly true in view of

both (1) the Justice Manual provisions requiring providing notice and the well-known requirements of federal statutes and (2) Judicial Conference regulations related to learned counsel, mitigation specialists, experts, and other resources necessary for an adequate defense in a capital case, which would have applied in the event that the government had announced that it was seeking the death penalty.

Therefore, the government should be estopped from seeking the death penalty.

**D. Permitting the Government to Seek the Death Penalty Violates Due Process Clause and Equal Protection.**

Failure to enforce the government's promise would not only result in a severe inequity, justifying application of the estoppel doctrine, it also would violate due process and equal protection. *Cf. Santobello*, 404 U.S. at 262 ("[A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.").

First, Mr. Meehan would be denied due process if the government could simply go back on its promises to him. Second, Mr. Meehan would be denied due process and equal protection if the government were permitted to seek the death penalty against him because his case was not resolved in 2023 when he was incompetent to stand trial. Mr. Meehan had a trial set for May 2023. That trial did not go forward because Mr. Meehan was incompetent to stand trial. Had the trial gone forward, this case would not have been pending at the time of Attorney General Bondi's February 5, 2025 memo, and Mr. Meehan would not have been subject to the directives in that memo or the January 20, 2025 executive order. Furthermore, the government's conduct in this case – i.e. giving formal notice that it would *not* seek the death penalty and then reneging on that representation more than three years later – was "arbitrary and capricious." *United States v. Littrell*, 478 F. Supp. 2d 1179, 1192 (C.D. Cal. 2007). This conduct "shock[s] the conscience"

and, thus, violates due process. *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (en banc) (noting that the "kind of executive conduct that fairly can be said to 'shock the conscience' ... and be 'fatally arbitrary in the constitutional sense' ... involves 'abusing [executive] power, or employing it as an instrument of oppression'") (alteration in original); *see also Shaffer v. Heitner*, 433 U.S. 186, 212 (1977) (due process violated when the conduct of the government offends "traditional notions of fair play and substantial justice").

Therefore, Due Process and Equal Protection also prohibit the government from reversing course and now seeking the death penalty, after formally issuing a "final decision" that the death penalty would not be sought.

### E. Permitting the Government to Seek the Death Penalty Would Violate the Eighth Amendment's Cruel and Unusual Punishments Clause.

Permitting the government to seek the death penalty in view of its prior explicit waiver would also violate the Eighth Amendment. What the government has done is both cruel and certainly unusual. Before the recent policy of the DOJ to reconsider capital cases in which the previous administration had formally disclaimed its intent to seek the death penalty, the DOJ had never engaged in such a diametric change in position. Such conduct, at the very least, "wanton[ly]" inflicts psychological trauma in violation of the Eighth Amendment. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986); *see also Beal v. Foster*, 803 F.3d 356, 357-38 (7th Cir. 2015)) (quoting *Watison v. Carter*, 668 F.3d 1108, 1112 (9th Cir. 2012) (holding that the Eighth Amendment prohibits unjustified infliction of physical *or* psychological pain); *United States v. Black*, 918 F.3d 243, 265 (2nd Cir. 2019) (holding that "magnitude of the anxiety and concern incurred" by being "forced for two years and ten months to worry over whether the government would seek not just their liberty, but their lives" was "great" and contributed to prejudice from delay).

Therefore, the Eighth Amendment also prohibits the government from reversing course and now seeking the death penalty, after formally issuing a "final decision" that the death penalty would not be sought.

**F. If the Court Treats the Government's November 18, 2025 Notice as an Amended § 3593(a) Notice, the Court Should Strike It Because "Good Cause" Does Not Exist.**

This is not an amended notice within the meaning of § 3593(a)(2), which suggests that the government may amend "the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death," not seek death after formally notifying the Court that it would not. However, if the Court were to construe the government's notice of its intent to seek the death penalty as an amendment to its July 2022 notice, the Court should not permit an amendment. Coming three years and four months after the "final" no-seek, the amendment is untimely. And the government certainly has not exercised reasonable diligence.

Section 3593(a) states that "[t]he court may permit the attorney for the government to amend the [death] notice upon a showing of good cause." 18 U.S.C. § 3593(a). The government has not sought leave to amend its notice, which is one reason why the Court should not construe the November 18, 2025, notice as an amendment or permit an amendment. More importantly, good cause does not exist for the government's attempt to amend its prior notice of its intent *not* to seek the death penalty. First, coming three years and four months after issuing what purported to be a final notice, any amendment is clearly untimely. Second, there is simply no argument that the government exercised due diligence.

"[I]t is clear that § 3593(a)['s] good cause [standard] must focus on the diligence of the government in uncovering the new information contained in the Amended Death Notice and the timing of when that information was obtained." *United States v. Le*, 316 F. Supp. 2d  343, 348-49

(E.D. Va. 2004); *see also id.* at 349 ("Here, as in other legal contexts, absent reasonable diligence, there can be no good cause.... [T]he burden is on the government to show reasonable diligence and hence good cause for amending the Death Notice.").

The only thing that has changed between July 2022 and November 2025 is a change in death penalty policy by the executive branch — which is not "good cause." The facts and law have not changed, except to the extent that there is even more evidence, from BOP's own doctors, of Mr. Meehan's mental illness, which is an additional reason *not* to seek the death penalty. Moreover, the government conducted its purported reauthorization proceedings while Mr. Meehan was incompetent and physically at a federal medical facility where government mental health professionals were attempting to restore his mental competency. A finding of incompetence is a finding that the defendant suffers from a "mental disease or defect" that renders him "unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241. Though more litigation concerning the "process" that produced the current Notice of Intent can be anticipated, suffice it to say here that proceeding while a defendant is mentally incompetent is unprecedented and at a minimum resulted in a process that lacked any fairness and resulted in a decision that is unreliable under the Eighth Amendment.

Additionally, the government's belated Notice of Intent does not comply with the deadlines the Court initially set for determining whether the government would seek the death penalty. In 2022, when the issue was first addressed, the Court set a deadline of July 28, 2022, for the government to state whether it would recommend an expedited no-seek or ask for a defense presentation on the death penalty. Tr. 6-9-2022 at 6. No other deadlines were set because the government filed its no-seek – then characterized as a "final decision" – before July 28, 2022.

But it is clear that deadlines were put in place to establish an orderly process, so the Court and the parties would know what they were preparing for. As the Court pointed out, whether or not the government would seek the death penalty was "a game changer." Dkt. #166 (Tr. 7-28-2022) at 6. Filing a Notice of Intent to Seek the Death Penalty on November 18, 2025, does not comply with this deadline – either literally or in spirit.

Under all the relevant circumstances, the government did not act diligently in seeking to amend its July 2022 § 3593(a) notice. *Spurlock* is instructive. The court held, in finding a lack of good cause, that "[t]he essential facts supporting the current charges and aggravators have been known to the government since the original indictment." *Spurlock*, 782 F. Supp. 3d at 1016. For the same reason, the government lacked reasonable diligence in filing its November 18, 2025 notice.

Moreover, the government's delay in bringing capital charges and its deliberate decision to renege on its prior formal notice that it was not seeking the death penalty has presumptively prejudiced Mr. Meehan. *Cf. Doggett v. United States*, 505 U.S. 647, 656-57 (1992). Therefore, even assuming the Court treats the November 18, 2025 notice as an amended § 3593(a) notice, it should deny the government leave to amend, because the government has not shown good cause.

**G. Allowing the Government to Seek the Death Penalty at Any Time, Regardless of Prior Assurances That It Would Not Seek the Death Penalty, Creates a System That Is Not Only Unfair, but Also Completely Unworkable.**

In addition to being unlawful and unjust, allowing the government to seek the death penalty against Mr. Meehan would also create a completely unworkable system for the federal courts, as well as federal defenders. If the government is permitted to reverse no-seek decisions, every case charged under a capital statute would necessarily remain a capital case, because the government could always change its mind. Courts (in overseeing assigned CJA counsel) and federal defenders (in overseeing their own attorneys) could never withdraw the enhanced

staffing, funding, and resources to which capital defendants are entitled under §§ 3005 and 3599—at least not until a plea is accepted or trial begins and jeopardy attaches.

In denying "no-seek" reversals, several district courts have recognized this problem and rejected the government's new position as contrary to established precedent. "[D]efense counsel and the Court would have to continue to treat every single capital-eligible case as a death case." *Spurlock*, 782 F. Supp. 3d at 1008; *see also Cole*, 2025 WL 2592515, at *14. Courts have also accurately observed that the government's regime would be "unworkable." *Spurlock*, 782 F. Supp. 3d at 1008; *accord Cole*, 2025 WL 2592515, at *14.

The precise scale of the disruption and cost is incalculable, but it would be immense. As undersigned counsel noted during the April 25, 2022, status conference: "death penalty cases are different. It's not just that they're more complicated, it's not just that they take longer, it's not a murder case o[n] steroids. . . . They're quantitatively and qualitatively different, and they are quantitatively and qualitatively different in part because of the amount of investigation that has to be done is more, but it's also different." Dkt. #68 (Tr. 4-25-2022) at 9. And whereas the federal courts and defender offices have historically provided enhanced staffing and resources to capital defendants in only about seven cases a year, they would now have to do so in roughly 150 additional cases annually.[9]

---

[9] One AO study of defense costs in federal death-eligible cases between 1998 and 2004 found that in cases in which a capital prosecution was authorized, the cost was nearly eight times greater than the cost of a case that was eligible for capital prosecution but in which the death penalty was not authorized. *See Report to the Committee on Defender Services Judicial Conference of the United States Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases*, at ix (2010), https://www.uscourts.gov/file/fdpc2010pdf.

For defendants represented by CJA counsel, additional counsel would have to be appointed, indefinitely, in every capital eligible case, along with mitigation specialists, investigators, and paralegals. Additional experts, focused on mental health and life history, would need to be retained. For defendants represented by federal defenders, all attorneys assigned to capital eligible cases would have to carry a reduced case load, to ensure they could devote the

**CONCLUSION**

The legal dispute at issue is not merely about a violation of Mr. Meehan's rights. Instead, "[a]t stake is the honor of the government [and] public confidence in the fair administration of justice." *Carter*, 454 F.2d at 428 (4th Cir.) (en banc). For the foregoing reasons, the Court should strike the government's November 18, 2025 notice (Dkt. #170), with prejudice.

Respectfully submitted,

*Monica Foster*
Monica Foster
Chief Federal Defender

*Gwendolyn M. Beitz*
Gwendolyn M. Beitz

*Joseph M. Cleary*
Joseph M. Cleary
Indiana Federal Community Defenders, Inc.
111 Monument Circle, Suite 3200
Indianapolis, IN 46204
317-383-3520

---

necessary time to their potentially cases, and these cases would also require mitigation specialists, investigators, paralegals, and experts. The federal defender system has operated under a hard hiring freeze for most of the last two years. It is anticipated this freeze will last into the foreseeable future, perhaps more than a year into the future. IFCD is already operating with a staff significantly less than what current work measurement formulas dictate is necessary. It cannot sustain reduced caseloads for the current attorneys.

The numbers cited above about the number of authorized capital cases and no-seek cases come from data compiled by the Federal Death Penalty Resource Counsel Project. *See* Federal Death Penalty Resource Counsel Project, *Declaration of Matthew Rubenstein Regarding the Length of Time Between Capital Indictment and the Government's Decision Not to Seek the Death Penalty Between 2010 and January 20, 2025*, available at https://fdprc.capdefnet.org/sites/cdn_fdprc/files/Assets/media-root/public/project-declarations/Authorization/Dec%20re%20Indict%20to%20Decision%20Not%20Auth%202010-2025%20%28Rubenstein_Oct%202025%29.pdf.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 21, 2025, a copy of the foregoing motion was filed electronically. Notice of this filing will be sent to the following parties of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*<u>Monica Foster</u>*
Monica Foster