UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cr-00002-JPH-CMM |
| | ) | |
| SHANE M. MEEHAN, | ) | |
| Defendant. | ) | |

**RESPONSE TO MOTION TO STRIKE**
**NOTICE OF INTENT TO SEEK THE DEATH PENALTY**

On November 21, 2025, the defendant, Shane M. Meehan (the "Defendant") filed a Motion to Strike the Notice of Intent to Seek the Death Penalty filed by the United States of America on November 18, 2025. (Docket No. 175.) The Defendant's motion should be denied for six key reasons.

**Procedural Background**

On July 8, 2021, the United States charged the Defendant by Criminal Complaint with one count of Premeditated Murder of a Federal Agent, in violation of 18 U.S.C. § 1114.[1] (Docket No. 1.) On January 19, 2022, a federal grand jury returned an Indictment against the Defendant charging the Defendant with, among other things, two death-eligible offenses: (1) Premeditated Murder of a Federal Agent, in violation of 18 U.S.C. § 1114 (Count 1); and (2) Using/Carrying/Discharging a Firearm During and in Relation to a Crime of Violence Causing Death, in violation of 18 U.S.C. § 924(j) (Count 3). (Docket No. 39.) The grand jury also found the existence of certain statutory factors relating to Counts 1 and 3 pursuant to 18 U.S.C. §§ 3591 and 3592. (*Id.*)

---

[1] The charges against the Defendant stem from the July 7, 2021 shooting of FBI Task Force Officer Gregory J. Ferency outside of the FBI office in Terre Haute, Indiana.

A jury trial was set for March 28, 2022.  (Docket No. 49.)  On March 4, 2022, the Court granted the Defendant's unopposed Motion to Continue and set the case for a status conference in April 2022.  (Docket No. 58.)  At the April 2022 status conference, based on the parties' recommendations, the Court opted against setting a trial date and, instead, set the case for a status conference on June 9, 2022.[2]  (*See* Docket Nos. 65 & 68.)

At the June 9, 2022 status conference, the Court set a follow-up status conference for July 28, 2022 and ordered the United States to "either notif[y] defense counsel that it will recommend an expedited decision not to seek the death penalty or . . . ma[ke] a firm commitment to a date for defense counsel to make its mitigation presentation" prior to July 28, 2022.  (Docket No. 70.)

On July 11, 2022, the United States filed a notice stating that it was not seeking the death penalty in this case.  (Docket No. 75.)

During the July 28, 2022 status conference, the parties agreed that the case would be "ready for trial in nine months."  (Docket No. 79.)  Approximately two weeks later, on August 10, 2022, the Court set the case for jury trial beginning on May 8, 2023.  (Docket No. 80.)

Six months later – and just over a year after the Defendant was indicted – counsel for the Defendant filed a Motion to Determine Mental Competency of Defendant.  (Docket No. 81.)  The Court granted that motion on March 2, 2023, and committed the Defendant to the custody of the Attorney General, pursuant to 18 U.S.C. §§ 4241 and 4247, for evaluation and, if necessary, treatment.  (Docket No. 82.)

---

[2] As of at least March 2022, counsel for the Defendant had a reasonable basis to question the Defendant's competency, as defense experts evaluated the Defendant on March 18, 2022 and April 15, 2022.  Thus, by March 2022, approximately eight weeks after the indictment was returned, counsel for the Defendant could not have pled their client guilty as they apparently had concerns about his competency.

In late March 2023, while the Defendant was still undergoing a competency evaluation, counsel for the Defendant filed an unopposed Motion to Continue the May 2023 trial. (Docket No. 83.) The Court granted that motion and reset the jury trial for October 30, 2023. (Docket No. 84.)

In June 2023, the Court received the results of the Defendant's competency evaluation, distributed that report to counsel of record, and instructed the parties to file a joint status report by July 17, 2023. (Docket No. 92.) In that status report, counsel informed the Court that due to anticipated competency litigation, the October trial date would need to be continued. (Docket No. 102.) Accordingly, in September 2023, counsel for the Defendant, citing the ongoing competency litigation, moved to continue the October 2023 jury trial. (Docket No. 106.) The Court granted that motion and reset the jury trial for March 4, 2024. (Docket No. 107.)

From October 2023 until January 2024, the parties filed joint status reports detailing the steps they were taking to prepare for an eventual competency hearing. (Docket Nos. 108, 110, 112, & 114.) On January 11, 2024, again citing the ongoing competency litigation, counsel for the Defendant filed an unopposed motion to continue the jury trial. (Docket No. 116.) The Court granted that motion and reset the jury trial for September 10, 2024. (Docket No. 117.)

In March 2024, the United States filed a motion to have the Defendant's competency re-evaluated and to set a deadline for filing a notice of insanity defense pursuant to Rule 12.2(a) of the Federal Rules of Criminal Procedure. (Docket No. 120.) The Court granted that motion, ordered that the Defendant undergo a re-evaluation of his competency to stand trial, and instructed the Defendant to file any notice pursuant to Rule 12.2(a) by April 5, 2024. (Docket No. 121.)

On April 5, 2024, the Defendant provided notice, pursuant to Rule 12.2(a), that he intended to pursue an insanity defense at trial. (Docket No. 122.) Accordingly, on April 11, 2024, the

United States filed a Motion for Mental Health Examination pursuant to 18 U.S.C. § 4242 and Rule 12.2(c) of the Federal Rules of Criminal Procedure.  (Docket No. 123.)  The United States requested that such evaluation occur while the Defendant was in the Attorney General's custody undergoing a re-evaluation of his competency to stand trial.  (*Id.*)

The Court granted the United States' motion on April 11, 2024, and committed the Defendant to the custody of the Attorney General for an evaluation pursuant to 18 U.S.C. § 4242. (Docket No. 124.)  The Court ordered that the sanity evaluation occur "during the time [the Defendant] is committed to the custody of the U.S. Attorney General . . . for competency re-examination pursuant to the Court's March 27, 2024 Order."  (*Id.*)

In July 2024, with the Defendant awaiting transfer to a Federal Bureau of Prisons ("BOP") medical center, counsel for the Defendant filed an unopposed Motion to Continue Trial.  (Docket No. 125.)  The Court granted that motion and set the jury trial for April 29, 2025.  (Docket No. 126.)

In October 2024, the Court received the results of the Defendant's competency re-evaluation.  (Docket No. 127.)  At the November 25, 2024 competency hearing, the Court concluded that the Defendant was not presently competent to stand trial.  Accordingly, the Court committed the Defendant to the custody of the Attorney General for hospitalization pursuant to 18 U.S.C. § 4241(d).  (Docket No. 136.)

On February 4, 2025, with the Defendant still at a BOP medical center receiving mental health treatment, counsel for the Defendant filed an unopposed Motion to Continue Trial.  (Docket No. 138.)  The Court granted that motion and continued the jury trial to October 6, 2025.  (Docket No. 139.)

On February 5, 2025, the Attorney General issued a memorandum, entitled *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions*,[3] which directed a review of the prior administration's decisions not to seek the death penalty. On April 3, 2025, the United States contacted counsel for the Defendant and invited them to make a written submission or presentation to the Department's Capital Case Review Committee ("CCRC"). On May 13, 2025, the United States provided counsel a list of dates and times during which the CCRC would be available for a mitigation presentation. Counsel for the Defendant requested July 21, 2025 at 1:00 p.m., which occurred as scheduled. Both before and after the mitigation presentation, counsel for the Defendant submitted materials in support of their position, which were provided to the CCRC or the Office of the Attorney General.

In August 2025, the parties were informed that the BOP was beginning its evaluation of the Defendant's sanity pursuant to 18 U.S.C. § 4242. (Docket No. 158.) Also in August 2025, counsel for the Defendant filed an unopposed motion to continue the October 2025 trial. (Docket No. 154.) The Court granted that motion and continued the jury trial to February 9, 2026. (Docket No. 157.)

On November 7, 2025, the Court received the results of the Defendant's sanity evaluation. (Docket No. 163.)

On November 18, 2025, the United States filed a Notice of Intent to Seek the Death Penalty. (Docket No. 170.) The instant motion followed on November 21, 2025. (Docket No. 175.)

On or about December 3, 2025, the Defendant was returned to the Southern District of Indiana after spending approximately 13 months at a BOP medical center. On December 5, 2025,

---

[3] The Memorandum is available at https://www.justice.gov/ag/media/1388561/dl (last visited December 10, 2025).

the Court granted the Defendant's unopposed motion to continue the February 2026 trial and continued the jury trial to August 17, 2026. (Docket No. 182.)

## Argument

The Federal Death Penalty Act ("FDPA"), 18 U.S.C. §§ 3591, *et seq.*, provides:

> If . . . the attorney for the government believes that the circumstances of the offense are such that a sentence of death is justified under the chapter, the attorney shall, a reasonable time before trial or before acceptance by the court of a plea of guilty, sign and file with the court, and serve on the defendant, a notice.

18 U.S.C. § 3593(a). The notice contemplated by this section is commonly known as a "Notice of Intent to Seek the Death Penalty" or "NOI." The NOI must "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(2).

Neither the FDPA nor any other statutory provision requires the United States to file a notice when it decides *not* to seek the death penalty. Although not statutorily required, the United States often files such notices (colloquially called "No-Seek Notices") to inform courts and defendants of its decision not to seek the death penalty. But, unlike the statutorily mandated process for filing a NOI, there is no similar process for filing a No-Seek Notice. Nor is there any statutory provision that prevents the United States from filing a NOI after previously filing a No-Seek Notice. This statutory silence in no way suggests a prohibition.

1.    **The Government is Permitted Under the Federal Death Penalty Act, 18 U.S.C. § 3593(a), to File a NOI After Filing a No-Seek Notice.**

Despite this statutory silence, the Defendant argues that once the United States declares its intention not to seek the death penalty, that declaration is irrevocable. (Docket No. 175 at 10-11.) In support of this argument, the Defendant relies on the District of Nevada's decision in *United*

*States v. Spurlock*, 782 F. Supp. 3d 987 (D. Nev. 2025). *Spurlock*, however, does not support the Defendant's contention that a No-Seek Notice is irrevocable. In *Spurlock*, the court cited three bases for striking the United States' NOI. *Per se* irrevocability of the NOI was not one of those reasons. *Spurlock*, 782 F. Supp. 3d at 1001. Instead, the district court's decision hinged on the United States' failure to comply with the court's order setting a deadline for filing a NOI. *Id.* at 1001-02. The *Spurlock* court indicated that but for its order setting a deadline for filing a NOI, the United States could have reversed its initial decision not to seek the death penalty. *See id.* at 1006-07 (stating that but for court deadlines, "an initial decision should not freeze future conduct in the exercise of prosecutorial discretion").

This Court should hold, consistent with the reasoning of the *Spurlock* court, that the United States has the authority to change from not seeking the death penalty to seeking the death penalty. It is well-established that the Executive Branch has "exclusive authority and absolute discretion" to decide what crimes to prosecute, including whether to charge capital crimes in an indictment. *See Trump v. United States*, 603 U.S. 593, 620 (2024) (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)). The law provides that the Executive Branch retains the ability to file a NOI up to a "reasonable time before trial." The United States does not surrender that authority by filing a notice that is not statutorily required. Moreover, the United States retains the capacity to withdraw a decision to seek the death penalty, *cf.* Justice Manual § 9-10.160, and the United States does not waive the right to reconsider and reverse a decision to seek the death penalty merely because it files a NOI.[4] *See United States v. Peoples*, 360 F.3d 892, 896 (8th Cir. 2004) (affirming the denial

---

[4] Examples of the United States' unchallenged withdrawal of previous NOIs in favor of No-Seek Notices abound. *See, e.g.*, *United States v. Nantz*, Case No. 6:19-cr-16-REW-HAI (E.D. Ky. Dec. 1, 2022) (Docket No. 399); *United States v. Burkhalter, et al.*, Case No. 4:18-cr-36-BCW (W.D. Mo. Aug. 30, 2022) (Docket No. 1217); *United States v. Zelaya Martinez*, Case No. 1:18-cr-123-

of a motion to strike a NOI where the United States filed a NOI, withdrew the NOI during the penalty phase of trial, and then refiled the NOI when the case was retried).

In other words, there is no statutory provision that prevents the United States from filing a NOI after previously filing a No-Seek Notice, and the Court lacks a legal basis to craft such a rule itself.

To the extent the Defendant argues that permitting the NOI to stand would "create a completely unworkable system," (*see* Docket No. 175 at 23-24), the United States submits that reading restrictions into the FDPA that are not contained in the text of the statute would have the same effect. If the Court concludes that once a No-Seek Notice is filed, it can never be changed to a NOI, then the United States could respond by announcing its intent to seek capital punishment in all capital-eligible cases merely to preserve its decision-making authority as a case develops. That, in turn, would result in wasted time, effort, and resources on the part of defense counsel and the judiciary. The United States should remain free before trial to exercise discretion to determine the extent of the social interest in prosecution. "An initial decision should not freeze future conduct," *United States v. Goodwin*, 457 U.S. 368, 382 (1982), and the Court should decline to strike the NOI.

**2.      The Government Has Not Waived its Right to Seek the Death Penalty.**

Nor was the July 2022 No-Seek Notice effectively a waiver of the United States' ability to seek the death penalty.

---

RDA (E.D. Va. Oct. 28, 2021) (Docket No. 1033); *United States v. Mills, et al.*, Case No. 2:16-cr-20460-MAG-RSW (E.D. Mich. Oct. 28, 2021) (Docket No. 1515); *United States v. Arnold*, Case No. 2:15-cr-20652-GCS-DRG (E.D. Mich. Sept. 13, 2021) (Docket No. 1760); *United States v. Madison*, Case No. 6:17-cr-15-RBD-LRH (M.D. Fla. Mar. 19, 2021) (Docket No. 771).

In order for waiver to apply, the United States would have to honor an agreement not to seek the death penalty in exchange for some consideration, such as a guilty plea. Here, however, there was no agreement. The United States' statement that it elected at that time to forego capital punishment was unilateral. It did not hinge on any agreed-upon commitment from the Defendant. The Defendant, therefore, has no right to "enforce" the United States' previous decision.

When the United States notified the Court that it would not seek the death penalty, the United States did not intentionally relinquish or abandon a known right. *United States v. Olano*, 507 U.S. 725, 733 (1993). Nothing in the No-Seek Notice said or implied anything about the ability of the Department of Justice—or, more to the point, the ability of a future Attorney General—to reconsider that decision.

Just as this Court possesses the inherent power to reconsider its decisions, so too do the Attorney General and the Department of Justice. *See In re Vivint, Inc.*, 14 F.4th 1342, 1351 (Fed. Cir. 2021) (stating that "[t]he power to reconsider is the power to decide"). The Court should not read into an exercise of the Executive's discretion a waiver of its right to reconsider that decision.

There was no waiver of the ability to pursue capital punishment in this case.

**3.    The NOI is not an "Amendment" to the Earlier No-Seek Notice, and Even if the Court Construes it as Such, it is Proper.**

The Defendant argues, in the alternative, that if the Court does not strike the NOI as an impermissible reversal of the United States' position, then the Court should view the NOI as an amendment of the United States' July 2022 No-Seek Notice and strike it because good cause does not support such amendment. (*See* Docket No. 175 at 21-23.) This argument fails for several reasons.

First, the NOI is not an "amendment" to the No-Seek Notice. Rather, it is—for the first time—the notice required by the FDPA to proceed with a capital case. *See* 18 U.S.C. § 3593(a)(2).

As discussed previously, the FDPA does not require, refer to, or contemplate a notice of intent *not* to seek the death penalty. The FDPA's only reference to amending the "notice" is a reference to amending the NOI itself. *Id*. Thus, the statute does not contemplate the filing of an NOI in the first instance as an "amendment" to anything.

The Defendant's argument, and the logic of *Spurlock*, are misplaced. A "good cause" analysis is not required because the NOI is not an amendment.

The *Spurlock* court observed that "the FDPA must be read either to prohibit withdrawal of a no-seek notice altogether or to require good cause to do so." 782 F. Supp. 3d at 1014. The court reasoned that "[r]eading the statute to allow reversal of a no-seek notice *without* good cause . . . would run contrary to the fundamental principles of statutory construction and public policy." *Id*.

Respectfully, this conclusion cannot be squared with the statute because, as discussed, the statute does not contemplate the notion of a "no seek notice" at all. The statute only references NOIs and amendments to NOIs, and there have been no such amendments in this case.

Further, *Spurlock*'s reference to public policy violates the canon that courts may not revise statutes to conform to policy. *See, e.g.*, *Republic of Hungary v. Simon*, 604 U.S. 115, 138 (2025) (stating that "policy concerns . . . cannot surmount the plain language of [a] statute"); *Patel v. Garland*, 596 U.S. 328, 346 (2022) (rejecting parties' interpretation of statute based on policy argument and noting "we inevitably swerve out of our lane when we put policy considerations in the driver's seat" because "policy concerns cannot trump the best interpretation of the statutory text"); *Intel Corp. Investment Policy Comm. v. Sulyma*, 589 U.S. 178, 188 (2020) (explaining that if policy considerations suggest that a statutory scheme should be altered, Congress must be the

one to do it); *Jay v. Boyd*, 351 U.S. 345, 357 (1956) (stating that "we must adopt the plain meaning of a statute, however severe the consequences"); *see also West v. Hoy*, 126 F.4th 567, 575 (7th Cir. 2025) (quoting *BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004)) (noting oft-repeated adage that the court's "'inquiry begins with the statutory text, and ends there as well if the text is unambiguous'").

Even if the Court concludes that the NOI is an amendment of the No-Seek Notice, it is still proper because the good cause standard has been met. The FDPA is silent on what is meant by "good cause," but courts generally analyze good cause through the lens of diligence by the government and lack of prejudice to the defendant. *See, e.g.*, *United States v. Pretlow*, 770 F. Supp. 239, 242 (D.N.J. 1991) ("A definition of good cause which emphasizes the good faith of the government and any resulting prejudice to the defendant is sufficient to protect the defendant's and the public's interest in adequate notice."); *see also United States v. Cuff*, 38 F. Supp. 2d 282, 285 (S.D.N.Y. 1999) ("Absent some showing of an unlawful or improper motive in the government's charging decision, or its timing, I have no authority to compel the government to prove excusable neglect."); *United States v. Pitera*, 795 F. Supp. 571, 573 (E.D.N.Y. 1992) (citing *Pretlow* and finding "good cause" to mean "the government's application was made in good faith and the defendant was not prejudiced").

As an initial matter, the United States has acted with diligence since it learned that the no-seek decision was being reviewed. On February 5, 2025, the Attorney General issued a memorandum that revived the federal death penalty, lifted the moratorium on federal executions, and directed the review of certain death-eligible cases. The Defendant's case was one such case and was selected for review. On April 3, 2025, the United States contacted counsel for the Defendant and invited them to make a written submission or presentation to the CCRC. On May

13, 2025, the United States provided counsel a list of dates and times during which the CCRC would be available for a mitigation presentation. Counsel for the Defendant requested July 21, 2025 at 1:00 p.m., which occurred as scheduled. Both before and after the mitigation presentation, counsel for the Defendant submitted materials in support of their position, which were provided to the CCRC or the Office of the Attorney General. On November 13, 2025, the Attorney General authorized and directed the United States to seek the death penalty. The next day, the United States informed counsel for Defendant of the decision, and on November 18, the United States filed its NOI, formally notifying the Court of its intention to seek the death penalty pursuant to 18 U.S.C. § 3593. (Docket No. 170.) Thus, once the United States was directed to seek the death penalty, the NOI was promptly filed. The United States has acted with diligence.

Moreover, the Defendant cannot establish that he has been prejudiced. Unlike *Spurlock*, in which "the government decided . . . to reverse course . . . *less than two weeks before trial*," 782 F. Supp. 3d at 1013 (emphasis added), here the NOI was filed 83 days before a trial date that the parties have conceded was not viable due to the unresolved competency issue.[5] (Docket Nos. 176 ¶ 3 (stating in a joint status report that the parties "indicated their shared belief that the February [2026] trial date was not realistic given the expected pretrial litigation regarding Mr. Meehan's competency"); *see also* Docket Nos. 177 ¶ 4 (citing anticipated competency litigation in support of a motion to continue February 2026 trial date); 154 ¶ 3 (citing anticipated competency litigation in support of a motion to continue October 2025 trial).; 138 ¶ 2 (citing competency-related matters as basis for continuance of April 2025 trial).)

---

[5] The competency issue has also excluded the Defendant from trial preparation, plea negotiation, or any other aspect of his own case management, rendering this case less developed (and less prepared for trial) than other cases charged around the same time.

To the extent the Defendant claims he would have litigated this case differently if he knew that he would be facing the death penalty, given the distance from any firm trial date, and the fact that the Defendant has been consistently represented by learned counsel since the inception of this case, the United States submits that the Defendant has a reasonable amount of time in which to make whatever strategic adjustments may be necessary. The parties have largely agreed, as expressed during the November 19, 2025 status conference, that a viable trial date in 2026 seems unlikely given the need to litigate the Defendant's competency to stand trial and to accomplish other necessary pretrial litigation. Indeed, the Court recently granted the Defendant's unopposed motion to continue trial and reset the trial for August 17, 2026. (Docket No. 182.)

Moreover, as of at least March 2022—two months after the Indictment was returned and four months before the No-Seek Notice was filed—counsel for the Defendant had reasonable cause to question the Defendant's competency, as the Defendant was evaluated by a defense expert for the first time on March 16, 2022. Given defense counsel's apparent concern about their client's competency—a concern that existed months before the No-Seek Notice was filed—the Defendant would have been unable to participate in trial preparation, plea negotiation, or any other aspect of his own case management. Thus, defense counsel's claim that they would have "resolved the case via plea or trial prior to January 20, 2025," (Docket No. 175 at 10), is illogical because from at least March 2022, defense counsel evidently believed their client was not competent and therefore they could not ethically have pled him guilty.

The Court should, therefore, decline to strike the NOI on this basis.

4.    **No Equitable Doctrines Apply to Estop the United States from Seeking the Death Penalty.**

The Defendant also argues that the equitable doctrines of judicial estoppel, equitable estoppel, and promissory estoppel preclude the United States from pursuing the death penalty in this case.  Not so.

a.    **Judicial Estoppel.**

"The doctrine of judicial estoppel is intended to protect the integrity of the judicial process."  *United States v. Christian*, 342 F.3d 744, 747 (7th Cir. 2003) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  Judicial estoppel is "an equitable concept providing that a party who prevails on one ground in a lawsuit may not in another lawsuit repudiate that ground."  *Id*. (citing *United States v. Hook*, 195 F.3d 299, 306 (7th Cir. 1999)).

> Judicial estoppel may apply when (1) the later position is clearly inconsistent with the earlier position; (2) the facts at issue are the same in both cases; (3) the party to be estopped convinced the first court to adopt its position; and (4) the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id*.

As an initial matter, it is unclear whether judicial estoppel can even apply to the federal government.  *See OPM v. Richmond*, 496 U.S. 414, 423 (1990).  At the very least, the Supreme Court has stated that it is "well settled that the Government may not be estopped on the same terms as any other litigant" because "the interest of the citizenry as a whole in obedience to the rule of law is undermined" whenever "the Government is unable to enforce the law" because of "an estoppel."  *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 60 (1984); *see also OPM*, 496 U.S. at 423 (reserving the question of whether "estoppel may not in any circumstances run against the Government" but recognizing that the arguments in favor of that rule are "substantial").

14

Beyond that, however, a change in policy by an administration should not be grounds for estoppel. Neither the Department's initial position—nor its current position—were taken in bad faith, to "derive an unfair advantage" for the government, or to "impose an unfair detriment" on the Defendant. *See Christian*, 342 F.3d at 747. When considering the elements of judicial estoppel, the final, "bad faith" element is considered the "determinative factor." *See, e.g.*, *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) (stating that "[w]ithout bad faith, there can be no judicial estoppel"); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (characterizing judicial estoppel as an "extraordinary remedy" that should only be employed when the party to be estopped has attempted to obtain an unfair advantage). As a result, courts typically only apply judicial estoppel when the party to be estopped intentionally misled the court to gain an unfair advantage—not where a party's position was based on inadvertence or mistake.

The Defendant cites *Spurlock* in support of his argument that the United States has acted with bad faith. *Spurlock*, however, is distinguishable.

Central to the *Spurlock* court's decision, was the fact that "the government decided . . . to reverse course . . . *less than two weeks before trial* . . . . " *Spurlock*, 782 F. Supp. 3d at 1013 (emphasis added). As previously noted, unlike *Spurlock*, in this case the United States filed its NOI nearly three months before a trial date that the parties have conceded was not viable in any event. (Docket Nos. 177 ¶ 4 (citing anticipated competency litigation in support of a motion to continue February 2026 trial date); 176 ¶ 3 (stating in a joint status report that the parties "indicated their shared belief that the February [2026] trial date was not realistic given the expected pretrial litigation regarding Mr. Meehan's competency").)

Moreover, at no point did the United States act in bad faith or engage in any affirmative misconduct. The Attorney General simply reconsidered an earlier position, at the direction of the

15

President, which it is the Executive Branch's prerogative to do. It is undisputed that the decision to seek or not seek the death penalty is wholly within the discretion of the United States. Exercising that inherent discretionary authority is not misconduct.

The United States also has not acted with the intent to gain an unfair advantage. The No-Seek Notice was not filed with the intent that a NOI would later be filed. Rather, when Attorney General Bondi reconsidered and reversed Attorney General Garland's no-seek decision, she was acting within her discretion and judgment. The fact that Attorney General Bondi disagreed with Attorney General Garland's decision does not make Attorney General Garland's decision intentionally misleading.

In sum, because the United States has not acted in bad faith, derived an unfair advantage for the government, or caused an unfair detriment to the Defendant, the Court should decline to apply the doctrine of judicial estoppel.

> **b.    Equitable Estoppel.**

For the same reasons, the Court should also decline to apply the doctrine of equitable estoppel.

"To establish equitable estoppel, the party claiming estoppel must show:  (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *Lewis v. Washington*, 300 F.3d 829, 834 (citing *LaBonte v. United States*, 233 F.3d 1049, 1053 (7th Cir. 2000)).   In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct."  *Id*. (citing *Gibson v. West*, 201 F.3d 990, 994 (7th Cir. 2000)).  "Affirmative misconduct 'requires an affirmative act to misrepresent or mislead . . . .'"  *Id*. (quoting *Gibson*, 201 F.3d at 994).

16

As previously noted, the United States has not engaged in any affirmative misconduct. The Attorney General simply reconsidered an earlier position, which it is her prerogative to do. Exercising that inherent authority is not misconduct.

Because the Defendant has not, and cannot, show any affirmative misconduct by the United States, the Court should not apply the doctrine of equitable estoppel.

### c.    Promissory Estoppel.

Nor has the Defendant established the elements of promissory estoppel. The doctrine of promissory estoppel provides that "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Restatement (Second) of Contracts § 90 (1979). Generally, promissory estoppel requires a "clear and definite" promise. *See id.*

Like equitable estoppel, promissory estoppel will not lie against the United States absent affirmative misconduct by a government agent. *See United States v. Vanhorn*, 20 F.3d 104, 112 n.19 (4th Cir. 1994); *United States v. Mraz*, 274 F. Supp. 2d 750, 753-54 (D. Md. 2003) (assuming sufficiency of defendant's allegations as to estoppel generally, allegations were insufficient for promissory estoppel claim because defendant did not allege affirmative misconduct by a government agent).

The application of promissory estoppel is generally limited in criminal cases to enforcement of plea or other written agreements. *See Cooper v. United States*, 594 F.2d 12, 16 (4th Cir. 1979), *overruled by Mabry v. Johnson*, 467 U.S. 504, 507-10 (1983); *see also United States v. Chiu*, 109 F.3d 624 (9th Cir. 1997) (proffer agreement); *United States v. Weaver*, 904 F.2d 1466 (11th Cir. 1990) (immunity agreement).

17

Here, the Defendant argues that the United States' No-Seek Notice was a clear and definite promise on which he detrimentally relied and, therefore, the United States should be estopped from seeking the death penalty. However, the United States' No-Seek Notice was neither a promise nor an agreement. Rather, it was precisely what it states—a notice of the United States' position at that time. It was not the result of bargaining between the parties, not in contemplation of consideration or mutuality of agreement, but rather by the decision-making authority of the Attorney General. And, because there was no clear and definite promise, there is no promise on which the Defendant could have reasonably relied to his detriment. As such, the Court should not apply the doctrine of promissory estoppel.

**5.      The United States has not Violated the Fifth or Eighth Amendments.**

**a.      The Fifth Amendment.**

The Defendant's Fifth Amendment arguments hinge on his characterization of the United States' filing of the NOI as "reneging" on its prior decision. But, as just discussed, the No-Seek Notice was never a promise. It was not negotiated for consideration and nothing in the FDPA prevents the United States from reconsidering its decision whether to seek the death penalty.

Nor was the decision to reconsider arbitrary or capricious. The FDPA itself provides sufficient limits on the discretion of sentencing bodies to withstand constitutional scrutiny. *See Gregg v. Georgia*, 428 U.S. 153, 195 (1976) ("[T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance."); *see also Jones v. United States*, 527 U.S. 373 (1999) (recognizing the constitutionality of the FDPA). Beyond that, the Capital Case Protocol ensures proper individualized consideration of the

18

appropriate factors relevant to a specific case. The Defendant cites no binding case law to undermine those propositions. Moreover,

> [A prosecutor's] broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.

*Wayte v. United States*, 470 U.S. 598, 607 (1985).

This discretion is, of course, not unfettered. A prosecutor may not seek greater punishment based on a defendant's exercise of a constitutional right. A prosecutor must also not pursue charges based on a discriminatory motive. But here, there is nothing to suggest that the NOI was filed because of any discriminatory motive, invidious classification, or improper motivation as to the Defendant. Those are the only grounds that would warrant judicial interdiction of such action.

Even if the Court adopts the reasoning from *United States v. Littrell*, 478 F. Supp. 2d 1179 (C.D. Cal. 2007), and considers on its own accord the propriety of the decision to seek capital punishment, the NOI should not be stricken. *Littrell* presented a factually unique circumstance in which the court viewed the defendant, who had already pled guilty to voluntary manslaughter, as less culpable than his co-defendants who either were not sentenced to death or against whom a death sentence was not sought. 478 F. Supp. 2d at 1189-91. In the face of these unusual facts, the *Littrell* court concluded that no rational decisionmaker would seek capital punishment and struck the notice. *Id.* at 1192. However, none of these unique facts are present in this case and the Court cannot conclude that under the circumstances, no rational decisionmaker would seek the death penalty.

To the extent the Defendant is arguing that the Court should strike the NOI due to outrageous government misconduct, this argument is usually only raised in situations that involve "extreme physical or mental brutality or where the crime is 'manufactured by the government from whole cloth.'" *United States v. Green*, 962 F.2d 938, 942 (9th Cir. 1992) (citation omitted). Even circumstances that are clearly improper do not necessarily rise to the level of outrageous misconduct. *See, e.g.*, *United States v. Nolan-Cooper*, 155 F.3d 221, 233 (3d Cir. 1998) (rejecting outrageous misconduct claim because sexual intercourse between law enforcement officer and defendant "was not necessarily intertwined with [the defendant's] offense conduct"). The Defendant has not identified any outrageous government misconduct and none exists. Accordingly, the Court should not strike the NOI for this reason.

With respect to any equal protection argument, the Attorney General's memorandum directed the review of *all* pending death-eligible cases. It does not violate equal protection principles that the Attorney General decided that absent significant mitigating circumstances, federal prosecutors are expected to seek the death penalty in certain cases—including those, like this one, involving the murder of a law enforcement officer.

> **b.    The Eighth Amendment.**

Finally, as to the Defendant's Eighth Amendment argument, the Defendant has not cited any authority for the proposition that facing the death penalty following a no-seek decision constitutes cruel and unusual punishment. Nor has he articulated how this constitutes a disproportionate punishment.

**Conclusion**

Accordingly, for all of the foregoing reasons, the Court should deny the Defendant's Motion to Strike.

Respectfully submitted,

THOMAS E. WHEELER II
United States Attorney

By:    /s/ Kathryn E. Olivier
Kathryn E. Olivier
William L. McCoskey
Lindsay E. Karwoski
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I certify that on December 12, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to counsel of record via the Court's electronic filing system. Counsel may access this filing via CM/ECF.

Monica Foster
Gwendolyn M. Beitz
Joseph M. Cleary
INDIANA FEDERAL COMMUNITY DEFENDERS, INC.
Monica_Foster@fd.org
Gwendolyn_Beitz@fd.org
Joe_Cleary@fd.org

/s/ Kathryn E. Olivier
Kathryn E. Olivier
Assistant United States Attorney